## ANNA BARD SUTLEY v. POLK COUNTY STATE BANK OF CROOKSTON.[1]

February 20, 1925.

No. 24,408.

**Mortgagee in possession of mortgaged cattle liable for neglect of proper feeding.**

1. A mortgagee of a herd of cattle, having acquired lawful possession, is obligated to feed and care for the same in a proper and reasonable manner, and neglect in this respect renders such mortgagee liable for such damages as resulted therefrom.

**Statutory authority of bank cashier to take chattel mortgage of cattle to secure bank.**

2. Under the provisions of section 6349, G. S. 1913, a cashier of a bank has power to take a mortgage on personal property to secure the payment of debts owing to his bank and, upon default in the conditions of the mortgage, to make arrangements with the mortgagor for the possession and care of the cattle on behalf of the bank.

**Bank liable like individual for acts of its agent.**

3. The cashier is regarded as an executive agent of a bank for whose acts, while engaged in its affairs, the bank is liable to the same extent that individuals are liable under like circumstances.

**Bank not acting ultra vires in trying to save its collateral.**

4. A bank may engage in such business as is necessary to pre-

[1] Reported in 202 N. W. 338.

serve property upon which it holds a lien and, where the same is undertaken in an effort to save the security, it is not ultra vires.

*Headnote 1. See Chattel Mortgages, 11 C. J. p. 591, § 284 (1926 Anno).

Headnote 2. See Banks and Banking, 7 C. J. p. 556, § 163 (1926 Anno).

Headnote 3. See Banks and Banking, 7 C. J. p. 549, § 160; p. 559, § 166.

Headnote 4. See Banks and Banking, 7 C. J. p. 589, § 223.

Action in the district court for Polk county to recover $5,382. The case was tried before Watts, J., and a jury which returned a verdict for $1,852. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Grady & Fosmark,* for appellant.

*W. E. Rowe,* for respondent.

QUINN, J.

Action to recover damages for alleged want of proper care of 45 head of cattle while under control of the defendant bank, as mortgagee. Plaintiff had a verdict for the sum of $1,852. From an order denying its motion for judgment in its favor or for a new trial, defendant appealed.

A somewhat detailed statement of facts will tend to a better understanding of the situation and of the issues involved in this lawsuit. In September, 1921, Zack T. Sutley, husband of the plaintiff, was indebted to the defendant bank, of which Charles E. Kiewel was president and James M. Hanson was cashier, in the sum of $4,200. At that time he executed to the defendant bank a mortgage upon 45 head of shorthorn cattle, which he owned, to secure such indebtedness which became due October 15, 1921. The mortgage was not filed for record until December 1, 1921. In November, 1921, Mr. Sutley went to the cashier and told him that he had arranged to sell the cattle to Striver Bros., delivery to be made in the spring of 1922, and that he had also arranged with Mr. Harrison, who operated the Buffington farm in Polk county, to winter the cattle for him.

At the trial, Sutley testified that Hanson said to him that he thought his arrangement would be all right but that, on the following day, Hanson came back and told him that he had talked the matter over with Mr. Kiewel and that they would not allow the cattle to be taken to the Buffington place; that, unless he would consent to the bank taking over the cattle and wintering them at Mr. Kiewel's farm, out a few miles from Crookston, they would foreclose the mortgage at once; that, in order to avoid a foreclosure, he acquiesced and that it was then agreed that the cattle should be delivered at the Kiewel farm on November 21, which was done; that, when plaintiff arrived at the farm with the cattle, Mr. Kiewel was there and directed him where to leave them; that, at that time, the cattle were all fat and in good, healthy condition; that they remained there during the winter; that some died and others declined and ran down in flesh and health because of the want of proper food and care; that, on December 19, 1921, he sold the cattle to his wife and gave her a bill of sale; that, in the spring of 1922, such of them that were alive were removed to the Kiewel pasture, some 8 or 10 miles distant, without his knowledge or that of his wife.

For the purpose of this appeal, it is conceded that Mr. Hanson told Mr. Sutley that, as cashier of the defendant bank, he refused to permit the cattle to be taken to the Buffington farm, for the reason that he did not believe that Mr. Harrison's financial standing was such that it would be for the best interest of the bank to leave the stock with him. It is contended on behalf of the appellant that the bank never undertook or agreed to winter the cattle, but did agree to advance sufficient money to pay for the actual expense of wintering them; that an agreement on the part of the bank to winter and care for such cattle would be an agreement beyond the power of the bank to enter into; that such agreement had never been authorized by its board of directors; that it had never been reduced to writing in accordance with the statute, section 6349, G. S. 1913; that, even if in writing, such contract would be void as to appellant because it was beyond the scope of its corporate powers and contrary to public policy. The defendant alleges, in its

answer, that the cattle were wintered at the Kiewel farm under an arrangement with Mr. Jorgen Hjort, a tenant of Mr. Kiewel, and that defendant advanced the required amount of money for that purpose; that Hjort acquired a lien upon the stock for so wintering such cattle, and similarly for wintering them the following winter by Mr. Donahue, and that, by reason of so advancing the money, the bank became subrogated to the liens acquired by Hjort and Donahue.

The reply put in issue the new matter contained in the answer and further set forth a novation, which included the McPeak Bros. as the third party, to the effect that plaintiff and her husband were released from the indebtedness to the bank, the McPeaks were substituted in their stead; that bill of sale for the herd of cattle was given to the McPeaks; that plaintiff conveyed to McPeaks 160 acres of land, clear of encumbrances, and assigned to them, for the defendant, a real estate mortgage of $2,000; that, in return therefor, the McPeaks gave to the defendant their note in the sum of $5,300, secured by a mortgage upon the cattle, and also gave defendant a mortgage on the 160 acres which they received from the plaintiff for $1,200, and also assigned to it the $2,000 mortgage which they received from the plaintiff.

The jury returned a general verdict in favor of the plaintiff for $1,852, also special findings to the effect that the defendant had the care of the cattle while on the Kiewel farms; that the herd was damaged in the sum of $2,400 while kept on the Kiewel farms by defendant; that the sum of $548 should be allowed defendant for wintering the cattle upon the Kiewel farm and that defendant's claim against plaintiff and her husband has been paid in full as set forth in the reply.

Section 6349, G. S. 1913, provides as follows: "In addition to the inherent and granted powers of corporations in general, such bank shall have power to exercise by its board of directors or duly authorized officers and agents, * * * all such powers as shall be necessary to carry on the business of banking * * * by lending money on real and personal property securities * * * and

by exercising all the usual and incidental powers and privileges belonging to such business."

It is very plain that, under the statute, a cashier of a bank has power to take mortgages on personal property to secure the payment of debts owing his bank, and that a person, acting in good faith, may deal with the cashier of a bank in the usual course of banking business with entire confidence that the acts and statements of the cashier, in the course of such dealings, are, in legal effect, the acts and statements of the bank.

Sutley was dealing with the bank. He was indebted to it. Acting through Hanson, he had executed the mortgage in question. It was past due. He was not prepared to pay. Under these circumstances, the cashier, with the advice of the president, informed the mortgagor that, unless the cattle be turned over and placed on the Kiewel farm for the winter, the mortgage would be foreclosed. We discover nothing in this course of dealing, other than an effort on the part of the cashier to make the bank's interest more secure. He was looking after what he considered the best interest of his bank, trying to perpetuate its security upon a past due obligation. His authority to act in the premises did not require a resolution of the board of directors nor was it beyond his usual and incidental powers as cashier.

We know of no law or precedent which would require a resolution of the directors to authorize the cashier to act under such circumstances. Surely the business public would be greatly amazed to learn that such acts and declarations of a cashier were not binding on the bank. Were it otherwise, there would be no safety in dealing with banking officials, unless the board of directors remained in session and open to public interview during banking hours. But it is said that the bank had no right to agree to feed and winter the stock, and that such an agreement was void as against public policy. The feeding and caring for the cattle, under the circumstances, was not in the nature of carrying on an independent business, other than that of banking, nor was it an adventure beyond the scope of the charter of the bank.

The doctrine of ultra vires has no application. The property pledged was live stock. The mortgagee had the lawful right to take the same under its mortgage. Having done so, it was bound to care for and protect the same in a proper and reasonable manner until the time of sale. Such care required sufficient food, water and shelter to keep them in proper condition. For a failure in this respect, the mortgagee should, and must, be held liable. Croze v. St. Mary's C. M. Land Co. 143 Mich. 514, 107 N. W. 92, 114 Am. St. 677; Huntoon v. Brendemuehl, 124 Minn. 54, 144 N. W. 426.

Mr. Sutley went to the bank, in December, 1922, to procure his papers. A difference arose between him and the cashier as to whether he had been overcharged. Finally, the cashier produced $16.07 in money, together with the papers, and offered to deliver the same, provided the bank be released from liability for damages to the cattle sustained at Kiewel farm. The offer was rejected. In the spring of 1923, the McPeak mortgage was foreclosed by the bank.

The cashier of the bank is generally regarded as the chief acting executive officer of a bank. The bank is liable for his acts, while engaged in its affairs, to the same extent that individuals are liable under like circumstances. Merchants' Nat. Bank v. State Nat. Bank of Boston, 10 Wall. 604, 676, (77 U. S. 604, 676), 19 L. ed. 1008; Security Savings Bank v. Smith, 144 Iowa 203, 122 N. W. 825, cases cited. So, a bank may engage in such business as is necessary to preserve property upon which it holds a lien, and, when the same is undertaken in an effort to save its security, it is not ultra vires. 1 Morse, Banks & Bank, §§ 59, 77, 78—165b, 228b; Ravinia St. Bank v. Kirkpatrick, 42 S. D. 184, 173 N. W. 863; Manny v. Spokane State Bank, 78 Wash. 230, 138 Pac. 682; Castana Sav. Bank v. Rinehart, 197 Iowa 253, 197 N. W. 34; Wing v. Commercial & S. Bank, 103 Mich. 565, 61 N. W. 1009. The defendant received all of the property turned over by the plaintiff to the McPeaks, also a chattel mortgage, upon the herd of cattle, which it saw fit to foreclose. It should not be heard to longer complain.

Affirmed.